**UNITED STATES of America, Plaintiff-Appellee,**

v.

**David Robert DENNIS, Defendant-Appellant.**

**No. 82–1062.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 13, 1983.

Decided March 9, 1983.

Gershwin A. Drain, Miriam Siefer (argued), Federal Defender Office, Detroit, Mich., for defendant-appellant.

Leonard R. Gilman, U.S. Atty., Detroit, Mich., John Thompson (argued), Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Before KEITH and MERRITT, Circuit Judges and BROWN, Senior Circuit Judge.

KEITH, Circuit Judge.

David Robert Dennis appeals his jury convictions for assault resulting in serious bodily harm in violation of 18 U.S.C. § 113(f), use of a firearm to commit a felony in violation of 18 U.S.C. § 924(c)(1), and possession of a firearm in violation of 18 U.S.C. App. § 1202(a)(1). For the reasons set forth below, we affirm the convictions on all counts.

On June 2, 1981 about 9:30 a.m. defendant, Dennis, entered the Social Security Office of Hearings and Appeals on the fourth floor of the McNamara Building in Detroit, Michigan. He approached the receptionist, Ms. Sandra Blackmon, and inquired about securing a house. Ms. Blackmon informed the defendant that he was in the wrong office and gave him directions to the Department of Housing and Urban Development (HUD). However, the defendant remained seated at the receptionist's desk, periodically nodding off to sleep. While he was seated, one of the employees noticed that the defendant had a gun. Federal Protective Officers were immediately summoned for assistance.

Shortly thereafter, defendant pulled a gun from his pocket and said, "Well, I'll get some action one way or the other." Federal Police Officers Tucker and Holman arrived as the defendant, with gun in hand, stood up and began to chase Ms. Blackmon. Officer Tucker identified himself and ordered the defendant to halt. When the defendant refused to stop, Officer Tucker grabbed him from behind. A struggle ensued during which Officer Tucker was shot twice.

Federal Protective Officers Jones, Hunt, Aycox and Lyons responded to a radio message "man on fourth floor and he . . . appeared to be drunk and he had a gun . . . ." The officers eventually wrestled the defendant to the floor, seized the gun, and placed him in handcuffs. Officer Jones testified that he heard defendant say, "He shouldn't have bothered me. I shot him. I tried to kill him." He was subsequently searched by Officer Jones and turned over to Detroit police officers Kenneth Hallas and Charles McDonald. They advised the defendant of his *Miranda* rights as they escorted him out of the building. The arrest was somewhat difficult in that the defendant refused to walk and later refused to get in the squad car.

They arrived at police headquarters shortly after 10 a.m. Upon arrival, the defendant was taken into an interview room. After a short wait, he was inter-

viewed by FBI agents Terrence McGinnis and Cary Thornton. Defendant was again advised of his *Miranda* rights, and he signed a waiver of rights form. During the interview which lasted approximately two hours, the defendant made two different statements regarding the events of the morning. He first told the agents that after he escorted his wife to work on the eleventh floor of the McNamara building, he stopped on the fourth floor. When the elevator doors opened, he noticed one person pointing a revolver at him and two other persons standing next to him. The defendant claimed that the people took his wallet and started beating him. This recitation of events conflicted with the information the agents already possessed. After some discussion about the conflicting information, the defendant made another statement. Officer McGinnis reduced the statement to writing and it was signed by the defendant.

The defense filed a motion to suppress Dennis' statements and argued that due to extreme intoxication, Mr. Dennis was incapable of waiving his *Miranda* rights or voluntarily making a statement. The defendant did not testify at the suppression hearing. Instead, the defense called a psychologist. Dr. Michael Abramsky testified that the defendant's ability to understand and knowingly waive his constitutional rights was severely impaired at the time in question due to a combination of alcohol and medicine. Dr. Abramsky's testimony was based on an August 24, 1981 examination of the defendant. He testified that the defendant, who was 50 years old, had been a chronic alcoholic for the last twenty years. The defendant began drinking in his early teenage years and was now manifesting signs of cerebral atrophy due to his prolonged intake of alcohol. Dr. Abramsky did not know exactly how much alcohol the defendant had consumed on the day of the shooting. However, he testified that the amount was unimportant because of the defendant's advanced stage of addiction. He had reached a stage where it would take less alcohol for him to become inebriated. However, the effect of alcohol would be multiplied due to his ingestion of medicine.

In denying the defendant's motion to suppress his post-arrest statements, the trial judge made the following findings:

I think when Mr. Dennis walked into the office, and when he was taken from the office to the police car, and when he was taken to the police station and when he was interrogated, he was somewhat under the influence of liquor.

I think, however, he understood what he was doing, that he was not beaten. I think there was an altercation of some kind, but I think he was not beaten. I think there was a scuffle. That he resisted and that there was a scuffle.

I think that he was given the warnings called for by the Constitution. I believe that he understood what those warnings meant; I think that when he talked to the officers, made his statement, he understood what he was saying.

The statements were made voluntarily; that he was not, at that time, sufficiently intoxicated that he was acting without free will, in any sense of the word. And that there was no overbearing on the part of the officers at that time so as to render the statements inadmissible.

■ On appeal, the defendant argues that the court's findings in determining voluntariness were clearly erroneous. We disagree. The central inquiry in determining voluntariness is whether the confession was the product of free and rational choice. *United States v. Brown,* 557 F.2d 541, 546 (6th Cir.1977): *See Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). If the defendant's capacity for self-determination is critically impaired, then the use of his confession offends due process. *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). In *Culombe,* the Supreme Court established a three-phase review process for resolving issues of voluntariness. The first phase is finding "the crude historical facts, the external, 'phenomenological' occurrences and events surrounding the confession." *Id.* at 603, 81 S.Ct. at 1879. The second phase concerns the "psychological fact" of

defendant's mental state and how he reacted to the external facts. The third phase involves application of standards for judgment and legal concepts to this "psychological fact" to determine the legal significance of how he acted. *Id. See Brown,* 557 F.2d at 547.

█ A review of the evidence reveals that there was conflicting testimony regarding the extent of the defendant's inebriation. Several witnesses testified that while the defendant appeared to have been drinking, he was cognizant of his surroundings and was able to communicate. In fact, the agent who interviewed the defendant at 1:00 stated that he smelled of alcohol but he was alert, candid, coherent, and acknowledged an understanding of his rights. In contrast, other witnesses testified that he appeared to be confused and incoherent. His clothes were soiled, disheveled, his pants unzipped and he was only wearing one sock. Even the police officers disagreed regarding the extent of the defendant's inebriation.

In addition, Dr. Abramsky's testimony was placed in issue. The record indicates that the doctor's only mental status examination of the defendant occurred on August 24, 1981, over two months after the shooting. The examination only lasted an hour and a half. His conclusions regarding the defendant's mental capacity at the time at issue were in large part based upon the defendant's recollection of the amount of alcohol he had consumed and his activities on that day. Moreover, Dr. Abramsky's testimony was contradicted by two medical witnesses who examined the defendant shortly after the shooting. In fact, a physician's assistant, Jeffrey McCree at the Federal Correction Facility in Milan, Michigan screened the defendant nine hours after the shooting at 6:30 p.m. on June 2, 1981. McCree testified that when he saw the defendant, he was not intoxicated and did not complain of withdrawal. The next day, Dr. James Franklin, chief of health at the Milan facility, examined the defendant. During the examination, the defendant did not complain of nor did the doctor observe any

signs of alcohol withdrawal symptoms. These medical observations sharply conflicted with Dr. Abramsky's testimony that the defendant would show signs of withdrawal within twenty-four (24) hours.

This case obviously presented very sensitive questions of fact which hinged on the court's assessment of credibility. However, we note that the trial court properly explored the facts in a lengthy suppression hearing where the court had an opportunity to observe the demeanor of witnesses and judge their credibility.

Great deference is afforded the trier of fact because of its ability to observe the witness' demeanor. "Resolution of testimonial conflicts and specific findings of fact by the trial court will not be disturbed on appeal unless it is clear from the record that an error has been committed." *Brown,* 557 F.2d at 547. Upon review of the entire record, we conclude that the findings of fact were not clearly erroneous.

█ The defendant's other assignments of error are equally without merit. The defendant contends that the court erred in its recitation of the jury instructions. This alleged error is based on count six of the indictment which charged the defendant with violating 18 U.S.C. App. § 1202(a)(1) which prohibits a felon from possessing a firearm. The original indictment specified that appellant had previously been convicted of Attempted Criminal Sexual Conduct. A motion to strike the nature of the prior felony was made in conjunction with an agreement to stipulate that the defendant had a prior felony conviction. The motion was granted, but in reading the indictment to the jury, the Court neglected to delete the surplusage.

Even if the Court had refused to strike language describing the nature of the prior felony conviction from the indictment, it would not constitute error. *United States v. Burkhart,* 545 F.2d 14, 15 (6th Cir.1976). *United States v. Fields,* 500 F.2d 69, 70 (6th Cir.), *cert. denied,* 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974). In this case the Court agreed to strike the language, but by mere inadvertence included the offense in

the instructions. This inadvertence did not constitute reversible error.

 Finally, the defendant argues that the trial court erred in denying the jury's request that Dr. Abramsky's testimony be reread. However, this Court has held that whether a jury's request, submitted during its deliberations, for the rereading of testimony should be granted or denied is a decision committed to the discretion of the trial judge. *United States v. Toney*, 440 F.2d 590, 592 (6th Cir.1971). We are unable to find an abuse of that discretion.

Accordingly, we affirm the judgment entered by the Honorable Charles W. Joiner of the United States District Court for the Eastern District of Michigan.