UNITED STATES of America,
Plaintiff-Appellee,

v.

David MURPHY, Rene Stauffer,
Defendants-Appellants.

Nos. 84–5296, 84–5297.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 2, 1984.

Decided May 31, 1985.

Before MERRITT, WELLFORD and
TIMBERS,* Circuit Judges.

* Of the Second Circuit, by designation.

William Oldfield, Cobb & Oldfield, Court appointed, David Davidson (argued), Covington, Ky., for R. Stauffer.

Louis DeFalaise, U.S. Atty., James E. Arehart (argued), Lexington, Ky., for plaintiff-appellee.

James Cobb, Cobb & Oldfield, Court appointed, David Davidson (argued), Covington, Ky., for D. Murphy.

Before ENGEL and KENNEDY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

ENGEL, Circuit Judge.

The primary issue in this criminal appeal concerns the voluntariness of inculpatory statements made by one of the defendants while he was being apprehended by an attacking police dog. We must decide whether these statements should have been excluded from evidence at trial even though they were made in the complete absence of any police misconduct or interrogation.[1]

We conclude that the statements should have been excluded as inadmissible despite the notable absence of police misconduct. However, because the remaining evidence of the defendant's guilt was so overwhelming as to persuade us that the error in admission of the evidence was harmless beyond a reasonable doubt within the purport of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and because no therapeutic purpose of deterring unlawful or unconstitutional police conduct would be served by requiring an otherwise error-free trial to be upset, we conclude that reversal and new trial are not constitutionally mandated. *See Chapman*, 386 U.S. 18, 87 S.Ct. 824; *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *United States v. Charlton*, 565 F.2d 86, 92 (6th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978).

## I.

In the early morning of October 11, 1983, two employees of the Boone State Bank in Florence, Kentucky were robbed at gunpoint just as they were preparing to transfer deposits from the night depository in the Florence Mall to the bank's nearby branch office. The two robbers, who wore dark gloves and blue and green coveralls and ski masks, took $185,522 in cash and checks. Immediately after the robbery, witnesses saw two men dressed in cover-

---

1. The defendants have raised several other claims of error. Defendant Stauffer argues that the admission of a statement made by Defendant Murphy to another co-defendant unfairly implicated Stauffer and violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Murphy in turn argues that the admission of Stauffer's statements violated Murphy's rights under *Bruton*. Both defendants claim that they were denied a fair trial because the holding cell in which they were kept while court was not in session could be seen from the jury box. Moreover, they argue that the prosecutor unfairly commented on their failure to testify and that the evidence was insufficient to prove that the money was stolen from a "bank," as defined by the federal statute. Finally, they claim that the trial judge improperly considered their lack of cooperation when he imposed their sentences. After a thorough examination of the record, we find no serious merit to any of these claims.

alls, ski caps and gloves transferring bags from a yellow 1974 Lincoln to a green van in the mall parking lot. A short time later, a police officer spotted the green van at an apparent rendezvous with a brown van in the parking lot of a Ramada Inn about one mile from the mall. When the occupants of the vans saw the police cruiser, they started to drive away. The officer stopped the brown van, and backup officers arriving a few minutes later found the green van abandoned in another part of the parking lot. Inside the two vans the police found various items connected with the robbery, including a loaded machine gun and several loaded hand guns; a Boone State Bank deposit bag and a Boone State Bank envelope containing money; and coveralls, ski masks and gloves matching the descriptions of those worn by the robbers.

The search for the two suspects who had fled from the green van concentrated in a wooded area near the Ramada Inn. Thomas Eppertson, an officer from the Covington, Kentucky Police Department was called to join the search with his police dog, Kino. Kino, a male German Shepard weighing approximately 88 pounds, had been trained extensively in tracking and apprehending suspected criminals. The dog picked up defendant Stauffer's trail in the woods and followed it to a large spruce tree in the front yard of a nearby house. Because he could not see into the tree's thick branches and because of the strong possibility that the suspect might be heavi-

ly armed, Officer Eppertson sent Kino into the branches to apprehend Stauffer.[2] Kino attacked Stauffer and dragged him out from under the tree. In the process, Kino bit Stauffer on the neck, arms and legs. After being dragged out from under the tree and while Kino was still on top of him, Stauffer began yelling and screaming, "You caught us. You caught us. Get this fucking dog off me. We shouldn't have robbed the bank. You caught us. Get the dog off." Because of his concern that Stauffer might be armed, Eppertson did not call Kino off until Stauffer had been handcuffed. After the arrest, Stauffer was taken to a hospital where he was treated for severe bite wounds.

Stauffer and Murphy were charged with one count of bank robbery, two counts of interstate transportation of a stolen motor vehicle, two counts of unlawful possession of a firearm and one count of unlawful possession of a machine gun.[3] Before trial Stauffer's attorney moved to suppress Stauffer's inculpatory statements on the ground that they amounted to an involuntary confession, coerced by the dog's attack. The magistrate who heard the evidence at the suppression hearing recommended that the statements be admitted. The district court judge initially hesitated[4] but later admitted the statements, apparently because the police had not been trying to elicit a confession and because the confession was reliable.[5] Both defendants

2. Defendant Murphy had been apprehended earlier in the woods by two other officers.

3. A co-defendant, Anthony Durham, was tried and convicted separately.

4. Plainly the trial judge was troubled by the prosecution's attempt to introduce the offending statements:

> THE COURT: I think it's prejudicial, unduly prejudicial, unduly prejudicial. The guy's being torn up by a dog. Also gives me a lot of *Bruton* problems and other problems I don't need in the record that otherwise is in good shape.
>
> \*    \*    \*    \*    \*    \*
>
> THE COURT: Finish up with everything else. Let me think about it. Just this is causing me problems we don't need in this

record. Let me hear the rest of the apprehension. We'll have to adjourn for lunch before it's finished anyway. So finish up everything but that. Let's see what else he says about this guy.

> \*    \*    \*    \*    \*    \*
>
> THE COURT: You've got overwhelming evidence against both of these guys. Why do you need this? It causes all kinds of problems on the appeal. I'm going to have to try this case twice as it is. I don't want to try it a third time. Bad enough to try it once.

Jt.App. at 277–78.

5. Because the police had not spoken to Stauffer before he made the statements, he could not have known he was suspected of bank robbery unless he had actually participated in robbing a bank.

were convicted by the jury on all six counts and were given heavy sentences.

The following circumstances are well established by the record here:

(a) The police had "probable cause" to believe Stauffer was a felon, and "exigent circumstances" existed to justify his arrest without a warrant.

(b) The police were guilty of no "misconduct" in using the dog to apprehend Stauffer.

(c) The police conduct of employing the dog to subdue Stauffer in fact induced the statements by Stauffer, and "but for" that conduct, though otherwise reasonable, the statements would not have been made.

(d) Stauffer was in great fear and pain from the attack of the dog when he made the statements.

(e) No *Miranda* warnings had been issued when Stauffer made the statements.

(f) Stauffer was "in custody" effectively at the time of his statements.

(g) There was no "interrogation" by the police.

(h) The police did not "intend" to elicit Stauffer's statements.

## II.

■ Normal case law concerning the administration of *Miranda* warnings does not apply in this case because Stauffer's statements were not in response to police interrogation or other efforts to elicit a confession. *See Rhode Island v. Innis,* 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1688–1689, 64 L.Ed.2d 297 (1980); *United States v. Avery,* 717 F.2d 1020, 1024–25 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984). However, the admission of a confession not obtained in violation of *Miranda* will still violate due process if the confession was given involuntarily. *United States v. Brown,* 557 F.2d 541 (6th Cir.1977); *cf. Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). Thus, the admissi-

bility of Stauffer's statements turns on whether they were voluntary.

The test that the Supreme Court has applied most consistently to determine voluntariness is whether the confession was the product of free and rational choice, with the focus on the state of mind of the accused at the time the confession was made. *See Mincey v. Arizona,* 437 U.S. at 398, 98 S.Ct. at 2416; *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961); *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). In *Culombe,* Justice Frankfurter wrote:

The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond,* 365 U.S. 534 [81 S.Ct. 735]. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

367 U.S. at 602, 81 S.Ct. at 1879.

■ In determining whether an accused's will has been overborne, courts look to the totality of the circumstances surrounding the confession and determine their psychological impact on the accused's ability to resist pressures to confess. *United States v. Brown,* 557 F.2d at 546. Some factors that courts have considered include the age of the accused, his level of education or intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the confession to a violent arrest and the inherent coerciveness of the setting in which the confession was given.

*Id.* at 546 n. 4 & 548. Thus, the question of voluntariness is a mixed question of law and fact.

■ In determining voluntariness, a reviewing court will not disturb the trial court's findings of the specific external occurrences and events surrounding the confession unless clear error appears on the record. However, the appellate court must independently determine how the accused reacted to the external events and the legal significance of how he reacted.[6] *Culombe v. Connecticut,* 367 U.S. at 603–05, 81 S.Ct. at 1879–80; *United States v. Brown,* 557 F.2d at 547–48.

In *Brown,* our court applied these principles to strike down as involuntary a confession made by an accused when he was emotionally distressed and feared that he might be beaten by police. Brown's arrest was violent,[7] although neither the district court nor the court of appeals expressly found any police misconduct. Although the police had administered *Miranda* warnings, our court found that Brown's confession to the firebombing on the way to the police station was involuntary.

The facts here are similar to those in *Brown* in several respects. In both cases, the police used physical force to make the arrest although the amount of force was not found to have been unreasonable under the circumstances. Like Brown, Stauffer was suffering from physical injuries when he made his incriminating statements although the injuries were not found to have been inflicted as punishment by the police. Here, Stauffer's actions at the time of his arrest indicate that he was afraid of the police dog. In Officer Eppertson's own words, Stauffer was "yelling and screaming" at him to get the dog off. Officer Eppertson testified that he would have been afraid had he been in Stauffer's position. Another officer who came on the scene while the dog was still on Stauffer testified that he stayed "maybe 15 or 20 feet" away because he had no control over the dog and presumably was afraid of what it might do. Stauffer's statements compel the conclusion that they were made in an attempt to persuade Officer Eppertson to call the dog off.

The government argues that *Brown* is distinguishable because (1) Brown had already been handcuffed and placed in a police cruiser when he confessed, (2) the circumstances of Brown's arrest were more coercive than the circumstances of Stauffer's arrest and (3) expert witnesses had testified that Brown was emotionally distraught. These factors are certainly relevant to consider in determining the voluntariness of Stauffer's statements; however, none of them is conclusive.

The district court gave two reasons for admitting Stauffer's statements. First, the confession was inherently reliable because Stauffer could not have known he was wanted for bank robbery unless he had actually robbed a bank.

In *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), the Supreme Court rejected the argument that reliability may appropriately be considered in determining voluntariness under the due process clauses of the Fifth and Fourteenth Amendments. In determining that two confessions introduced in a state court murder trial were voluntary, both the trial

---

**6.** The government cites *United States v. Dennis,* 701 F.2d 595 (6th Cir.1983), in support of its contention that Stauffer's capacity for self-determination was not critically impaired. In *Dennis,* we applied the "clearly erroneous" standard in affirming the district court's finding that the defendant was not so intoxicated when he confessed as to render his confession involuntary. However, that standard does not apply in this case. Unlike *Dennis,* there is no dispute here about the external facts surrounding Stauffer's confession. The only disagreement concerns Stauffer's reaction to the events and the legal significance of his reaction.

**7.** At the time of his arrest, Brown was suspected of firebombing a Planned Parenthood Association clinic and of shooting several police officers. While the arresting officer was searching him for weapons, Brown made what appeared to be a move for his gun. The officer immediately kicked Brown's feet out from underneath him in apparent concern for the officer's own safety. When Brown continued to struggle, other officers helped subdue him.

court and the state supreme court considered whether the confessions were reliable. The Supreme Court reversed the conviction and remanded the case for a new trial, holding that "a legal standard which took into account the circumstance of probable truth or falsity ... is not a permissible standard under the Due Process Clause." *Id.* at 543-44, 81 S.Ct. at 740-41. The Court said that the question of voluntariness was to be answered "with complete disregard of whether or not petitioner in fact spoke the truth." *Id.* at 544, 81 S.Ct. at 741.

The district court's second reason for admitting Stauffer's confession is that it was not made in response to any police attempt to elicit a confession. The government's brief places great emphasis on the fact that the police were not questioning Stauffer or otherwise trying to get him to confess.

Because most involuntary confession cases involve police interrogation, few courts have decided whether statements can be involuntary when made in the complete absence of police intent to elicit a confession. In *Brown*, our court held the confession involuntary even though the defendant offered to tell the police "everything you want to know" before they questioned him. In a footnote we stated:

> Testimony by police officers that a suspect "volunteered" the incriminating information does not foreclose our inquiry into the voluntariness of the confession. That the accused rather than the police may have initiated that conversation is a relevant fact to consider, but it certainly is not conclusive of the question.

557 F.2d at 551 n. 12. That a suspect confessed when the police had no intention of eliciting a confession would in most cases be strong evidence that the confession was voluntary, but it cannot be conclusive of the question of voluntariness.

A related, but slightly different, issue is whether the statements should be considered voluntary because there was no police misconduct. Some Supreme Court decisions dealing with voluntariness turn upon whether police misconduct or coercion is present in the record. For example, in *Rogers* Justice Frankfurter wrote: "The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined ..." 365 U.S. at 544, 81 S.Ct. at 741. This emphasis led some courts and commentators to interpret the exclusionary rule in the Supreme Court confession cases as analogous to the rule excluding the products of an illegal search or seizure. *See Developments in the Law—Confessions,* 79 Harv.L.Rev. 935, 969 & n. 120 (1966), and authorities cited therein. Under this analysis the primary reason for excluding the confession would be to remove the incentive for improper interrogations. The suspect's state of mind when he confessed would be largely irrelevant: if the confession were the result of police misconduct, it would be excluded; if not, it would be admitted.

In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), however, the Supreme Court indicated that the absence of an improper police purpose was not controlling on the issue of admissibility. In that case an ailing suspect had been given hyoscine—a drug purported to have the properties of a "truth serum"—to ease his pain. The Court held that any confession given as a result of the drug's effect was constitutionally inadmissible even though the police knew nothing of the effect. The Court stated:

> It is not significant that the drug may have been administered and the questions asked by persons unfamiliar with hyoscine's properties as a "truth serum," if these properties exist. Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible.

The Court has usually so stated the test. See, *e.g., Stroble v. California,* 343 U.S. 181, 190 [72 S.Ct. 599, 603, 96 L.Ed. 872]:

"If the confession which petitioner made ... was in fact involuntary, the conviction cannot stand...." And in *Blackburn v. Alabama*, 361 U.S. 199 [80 S.Ct. 274, 4 L.Ed.2d 242], we held irrelevant the absence of evidence of improper purpose on the part of the questioning officers. There the evidence indicated that the interrogating officers thought the defendant sane when he confessed, but we judged the confession inadmissible because the probability was that the defendant was in fact insane at the time. *Id.* at 308–09, 83 S.Ct. at 754–55 (footnote omitted). Thus, it appears that where a confession is in response to police interrogation it may be involuntary in the absence of any improper purpose or misconduct by the police.

■ Under the facts of this case, we are bound to conclude that Stauffer's confession was not the product of free and rational choice. That the statements contained indicia of reliability and that the police were not attempting to elicit a confession are not sufficient to render the statements voluntary under the undeniably coercive circumstances in which they were made. The statements should have been excluded as involuntary.

### III.

Having determined that Stauffer's statements were involuntary, we must decide whether their admission nevertheless may be treated as harmless error. The Supreme Court has not squarely addressed the issue of whether admission of an involuntary confession may be harmless since its landmark holding in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that a federal constitutional error can be held harmless.

Several earlier Supreme Court decisions held that the admission of an involuntary confession requires reversal regardless of other evidence of guilt. *E.g., Haynes v. Washington*, 373 U.S. 503, 518, 83 S.Ct. 1336, 1345, 10 L.Ed.2d 513 (1963); *Lynumn v. Illinois*, 372 U.S. 528, 537, 83 S.Ct. 917, 922, 9 L.Ed.2d 922 (1963). Coerced confessions are routinely included when the Court lists constitutional infractions that "can never be listed as harmless error." *See, e.g., Chapman*, 386 U.S. at 23 & n. 8, 87 S.Ct. at 827 & n. 8. The case most often cited to support the proposition that the introduction of a coerced confession can never be harmless error is *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). In that case the Court held that the admission of a plainly involuntary confession required a new trial. The Court held that "even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment." *Id.* at 568, 78 S.Ct. at 850.

As we noted in *United States v. Charlton*, 565 F.2d 86, 92 (6th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978), at least one Supreme Court case subsequent to *Chapman* apparently has applied the harmless error rule in the context of an alleged involuntary confession. *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).[8] In *Milton* the prosecution introduced a confession that the defendant had made to a police officer who gained his confidence while posing as a cell mate. The defendant, who was represented by appointed counsel when he confessed, argued that the statements were involuntary under the Fifth Amendment and were obtained in violation of his right to counsel under the Sixth Amendment. The Court assumed *ar-*

8. Subsequent Supreme Court decisions do not appear to perceive any inconsistency between *Milton* and the earlier cases, although the issue has not been directly addressed. For example, one recent Supreme Court opinion cited *Payne v. Arkansas* for the proposition that the intro-duction of coerced confessions can never be harmless error and, in the same paragraph, cited *Milton* for the proposition that other constitutional errors may be harmless. *Connecticut v. Johnson*, 460 U.S. 73, 81–82, 103 S.Ct. 969, 974–975, 74 L.Ed.2d 823 (1983).

*guendo* that the statements were inadmissible but found their admission harmless beyond a reasonable doubt. The Court made special note that the overwhelming evidence included three full and validly obtained confessions. The inadmissible confession was merely cumulative of these.

Most involuntary confession cases are muddied by conflicting evidence or evidence, which if uncontradicted, is at least subject to differing interpretations. In contrast, the facts come to us here in almost clinical clarity and enable us to determine that the error of introducing Stauffer's involuntary confession meets the "harmless beyond a reasonable doubt" standard set forth in *Chapman*. Stauffer and Murphy were observed by one witness or another almost without interruption from shortly before the robbery until their unusual apprehension. A witness inside the mall positively identified the defendants as the men he had seen dressed in blue and green coveralls and ski caps talking outside the night depository door immediately before the robbery. The bank employees testified that the robbers were wearing blue and green coveralls and ski masks. A few minutes after the robbery, another witness saw a yellow Lincoln speed across the mall parking lot and pull up near a green van. Two men dressed in gloves and blue and green coveralls and ski caps got out of the Lincoln, transferred bags from the car to the van, and drove off in the van. Two Boone State Bank deposit bags were later recovered from the Lincoln. Minutes later, a maid at a Ramada Inn near the mall saw Stauffer, with his arms full of clothes, emerge from the Inn, run across the parking lot and jump into a

green van that was backing out of a parking space. Seconds later, a police officer, who was parked in another area of the Ramada Inn lot watching a brown van believed to be involved in the robbery,[9] saw the green van round a corner and head toward the brown van. The officer identified Murphy and Stauffer as the occupants of the green van. When both vans started to drive away, the officer stopped the brown van. A few minutes later, two customers entering a neighboring Dunkin' Donuts saw Stauffer and Murphy run through the Dunkin' Donuts parking lot, drop something brown in the bushes and run across the highway. Backup officers arriving at the scene found the green van abandoned in the Ramada Inn parking lot. In it they discovered the clothing and weapons used by the robbers as well as some of the loot from the bank. They also found a pair of brown gloves in the bushes near the Dunkin' Donuts and three large bags from the bank on the side of a nearby hill. The officers pursued Stauffer and Murphy into a wooded area across the highway from the Ramada Inn and eventually apprehended them in the same general vicinity. All of this evidence was uncontradicted at trial.

The defense attorneys candidly expressed to the judge their frustration at their clients' lack of cooperation in helping to establish a viable defense. The only hope they expressed was that if their clients could be induced to testify,[10] they might be able to show that others were more responsible for the planning of the robbery than were the defendants. As the trial judge recognized, this theory might tend to establish mitigating circumstances,

9. Approximately one month before the robbery, Officer Staggs of the Florence Police Department had observed and questioned a third participant, Anthony Durham, in the early morning outside the mall, near the Boone State Bank. After a background check had revealed that Durham and his companion of that morning had criminal records in Indiana, Officer Staggs had sent out a flier warning other local police to watch for Durham and his brown van, which bore the inscription "Polynesian Lady." When Officer Staggs learned of the robbery on the morning of October 11, he immediately notified

all officers in the area to be on the lookout for the "Polynesian Lady" van. Not long afterward, Officer Chris Ratcliff spotted the van in the Ramada Inn parking lot. He had been watching it for only a few minutes when Stauffer and Murphy drove up in the green van.

10. Apparently the defense attorneys were unable to persuade their clients to take the stand because the defendants were afraid of retribution should they implicate Anthony Durham, who was yet to be tried.

which would come into play in sentencing. However, it does not go to the question of guilt, nor does the speculation by defense counsel about what the defendants might have testified suggest in any way that the jury would have been less inclined to convict had Stauffer's statements been excluded. The evidence, while circumstantial, was of the strongest and most varied type. It consisted of the testimony of a number of officers, the victims, the owners of the stolen vehicles, and bystanders who observed and identified the defendants. In sum, the circumstantial and corroborating evidence was massive.

In concluding that the error here, if of constitutional proportions, was in any event harmless beyond a reasonable doubt, we have read the full six volumes of appendix which have been furnished to us by the parties. Although the appendix does not contain the entire trial transcript, we are confident that it contains the bulk of the probative evidence in the case. Suffice it to say that the evidence was indeed overwhelming, as the trial judge recognized. *See supra* note 4. Two considerations, however, arguably detract from this conclusion.

First, the defendants contested their guilt through the entire trial, and the two bank employees were not able to identify the defendants as the bank robbers because the robbers' faces had been covered by ski masks. Other than the fact that the robbery victims did not see the defendants' faces, it would be difficult to imagine a stronger case for the prosecution. Although the defense introduced some evidence that one of the defendants was in Indiana on the evening before the robbery, there was no effective evidence to contradict the government's proof concerning the facts of the robbery itself.

The second question that might be raised concerning the harmlessness of the error is why the government would have insisted on introducing such dangerous evidence if its case were otherwise so overwhelming. This question was put to the prosecuting attorney by the trial judge. *See supra*

note 4. The answer given is at least plausible. At that time, the prosecutor was concerned that the defendants would seek to come forward and with some kind of proof that would lay all of the blame for the robbery on Durham and others and, thus, would absolve them by implication. In retrospect, we think that the prosecutor would have been much wiser to wait until such evidence was introduced. It never was.

Our only real difficulty in this case is our uncertainty about precisely what standard the Supreme Court intends to apply with respect to the doctrine of harmless error. We recognize that the facts here are not on all fours with those in *Milton*. However, having found that the introduction of Stauffer's statements was harmless beyond a reasonable doubt, we believe that the only purpose to be served by reversing would be to deter unlawful police conduct. Although there was an element of coercion here, there was no police misconduct. As shocking as a police dog attack may at first blush appear, in the context of this case it may in fact have saved the lives of both the defendant Stauffer and the police officers. The police knew that the robbers they were seeking had been heavily armed at the time of the robbery. They also knew that a cache of arms, including an automatic machine gun, had been discovered in the van from which the defendants had fled. Defendant Murphy had stood off another police officer at the time of his arrest, had grappled for the officer's gun and had even invited that officer to kill him. It was far better for Officer Eppertson to have sent the police dog in after Stauffer than to have endeavored to subdue him with firearms. We cannot fault the officer in any way for having used the dog to apprehend Stauffer, and there is no suggestion in the record that his conduct was influenced by any hope of extracting a confession. Under such circumstances, we think that the harmless error rule of *Chapman* ought to be applied. Applying it here, we are fully confident that the introduction of the state-

ment was harmless beyond a reasonable doubt.

AFFIRMED.

KENNEDY, Circuit Judge, concurring.

I concur in Part III of the majority's opinion that the admission of the confession was harmless beyond a reasonable doubt. I also concur in footnote 1 that there is no merit to the other claims raised by appellants.