802 F.2d 460
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John MONTANA aka Sonny, Defendant-Appellant.
 No. 84-3674.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 15, 1986.
 
 Before WELLFORD and MILBURN, Circuit Judges; and DeMASCIO, District Judge*.
 PER CURIAM.
 
 
 1
 Defendant-appellant John Montana was indicted in December 1982 in the Northern District of Illinois on a charge of mail fraud in violation of 18 U.S.C. Sec. 1341. He was subsequently indicted in the Northern District of Ohio on charges of interstate transportation of stolen property in violation of 18 U.S.C. Sec. 2314, wire fraud in violation of 18 U.S.C. Sec. 1343, and conspiracy in violation of 18 U.S.C. Sec. 371. The indictments were consolidated for trial in the Northern District of Ohio, and a jury found defendant guilty on all four counts. For the reasons that follow, we affirm.
 
 I.
 
 2
 The following statement of the facts underlying defendant's conviction is based primarily upon the testimony of James McLean. In December 1980 or early January 1981, Gail Toney contacted James McLean and requested his assisaining access to $50,000 hidden in the Chicago home of Henry Podborny. Toney indicated that the money had been hidden in the Podborny home by Toney's mother-in-law Dimple Podborny. At that time Dimple was living with Toney in Cleveland and was in the process of divorcing her husband, Henry Podborny. Toney asked McLean if he knew anyone who could assist them in getting the money out of the house. McLean contacted defendant about the scheme and arranged a meeting.
 
 
 3
 At that meeting, Toney explained that $50,000 was hidden in Henry Podborny's house and that she would provide a map of the house and keys to anyone who would assist her. Toney further explained that a large sum of money was kept in the safe of Henry Podborny's company along with some documents that concerned the illegal activities of a member of Congress. Defendant expressed interest in the scheme and agreed to go to Chicago and get the money out of the house.
 
 
 4
 Toney, McLean and defendant met again during the second week of January 1981. Toney provided defendant with keys to the Podborny home and to the business premises. She also gave defendant a detailed map of the Podborny home depicting where the money was hidden. Toney then explained that she and Dimple would lure Henry Podborny to Cleveland under the pretext of attempting to resolve their marriage difficulties and hold him there against his will.
 
 
 5
 Toney also informed defendant that over a period of time she and Dimple deposited $600,000 in a safety deposit box in Indiana. Defendant suggested that they withdraw the money and permit him to rob them of the money. The purpose of the scheme was to cut Dimple out of her share of the money. Toney agreed to the scheme and stated that she would give defendant and McLean $100,000 for their participation.
 
 
 6
 Henry Podborny arrived in Cleveland on January 29, 1981, and was met by Toney. Podborny was taken to Toney's brother's house where he was restrained and robbed. Podborny was murdered but his body was not discovered until April 24, 19 81. On February 1, 1981, Toney and Dimple traveled to the Podborny home in Chicago and discovered that the money hidden there had been removed.
 
 
 7
 During the week of February 16, 1981 Toney, McLean and defendant met for a third time. Toney expressed concern that she and Dimple were receiving numerous inquiries from Henry Podborny's friends and relatives concerning his whereabouts. Toney produced a letter that Henry had mailed to Dimple in January 1981 expressing his desire to reconcile tlieir marriage. Defendant agreed to take the letter to New York and mail it to Chicago. McLean tore off that part of the letter exhibiting the January 1981 date, and defendant used a knife to give the letter a straighter, more, defined edge. McLean addressed an envelope to Dimple at the Podbornys' address in Chicago and handed the letter to defendant who placed it in another envelope or a plastic bag.
 
 
 8
 Robert Johnson, an employee of Henry Podborny, testified that in late February or early March 1981, Dimple Podborny went to her husband's place of business and showed him a letter. The envelope that contained the letter was addressed to Dimple and bore a New York postmark. The envelope contained a note indicating that Podborny would be home soon and was signed "Hank." Sometime later, defendant placed a call to Toney in Chicago who indicated that the letter had been received.
 
 
 9
 In mid-February 1981, Special Agent Frederick Graessle of the FBI received information that an individual namedJames McLean was attempting to negotiate checks belonging to Henry Podborny and was attempting to have funds transferred by wire from Podborny's bank account in Chicago to a Cleveland bank. On March 6, 1981, McLean was arrested on charges stemming from his efforts to negotiate checks belonging to Podborny. After his arrest, McLean was questioned concerning his knowledge of Henry Podborny's whereabouts, and he agreed to cooperate with the government.
 
 
 10
 McLean met with defendant on April 6, 1981, and was monitored by the FBI. McLean explained to defendant that in light of the fact that several persons had been arrested in connection with Podborny's disappearance, McLean was concerned that he and defendant would be implicated. McLean told defendant that he was especially concerned about the letter that had been mailed to Dimple from New York. McLean and defendant agreed to deny helping Toney and to deny any knowledge of the letter.
 
 
 11
 On April 9, 1982, Special Agent Gary L. Hall interviewed defendant in Cleveland. Special Agent Hall explained to defendant that the purpose of the meeting was to clear up some details about Podborny's murder. Hall questioned defendant concerning the meetings he had with McLean in 1981. Defendant stated that Toney and McLean wanted him to mail a letter from New York to Chicago but denied ever seeing the letter.
 
 
 12
 On September 2, 1982, Special Agent Graessle interviewed defendant. Defendant acknowledged that he attended several meetings with McLean and Toney. Defendant also admitted that the letter was designed to convince Podborny's friends that he was in New York but denied mailing the letter.
 
 II.
 
 13
 A. Amendment of the Indictment.
 
 
 14
 Defendant argues that the district court constructively amended the indictment, which alleged that defendant "caused the letter ... to be placed in a depository for mail matter in the state of New York," by instructing the jury that the government need not prove that defendant actually mailed the letter but only that he "possessed the letter with knowledge that use of the mails was reasonably foreseen." Rule 30 of the Federal Rules of Criminal Procedure provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto ...." Rule 30 must be read in conjunction with Rule 52 (b) of the Federal Rules of Criminal Procedure which permits the reviewing court to notice "plain errors" even though they were not brought to the attention of the district court. Because defendant did not object to the district court's mail fraud instruction, the "plain error" standard of review is applicable here.
 
 
 15
 The district court's mail fraud instruction defined the term "cause," as used in the mail fraud statute and the indictment, to include acting with knowledge that the mails will be used or with a reasonable basis to foresee that the mails will be used. That definition is in accordance with the well-settled construction of the mail fraud statute. See United States v. Maze, 414 U.S. 395, 399 (1974) (a defendant "causes" the mails to be used where he acts with knowledge that the mails will be used or with a reasonable basis to foresee that the mails will be used). Thus, we cannot conclude that the district court's instruction was " 'a material alteration of the theory of criminal liability presented in the indictment' which would constitute plain error." United States v. Gonzalez, 697 F.2d 155, 157 (6th Cir.1983) (per curiam) (quoting United States v. Jones, 647 F.2d 696, 700 (6th Cir.), cert. denied, 454 U.S. 898 (1981) ).
 
 
 16
 B. Evidentiary Rulings.
 
 
 17
 Defendant argues that the district court abused its discretion by excluding the testimony of FBI Agent Jack McCoy that defendant, during an interview on September 2, 1982, expressed his willingness to submit to a polygraph examination. Evidence of a defendant's willingness or unwillingness to take a polygraph examination is inadmissible. United States v. Cardarella, 570 F.2d 264, 266-67 (8th Cir.), cert. denied, 435 U.S. 997 (1978); United States v. Bursten, 560 F.2d 779, 785 (7th Cir.1977); cf. United States v. Fife, 573 F.2d 369, 373 (6th Cir.1976), cert. denied, 430 U.S. 9 3 3 (1977) (the results of a polygraph examination are not admissible and there is no abuse of discretion in excluding evidence that one has been taken). "Such evidence is so unreliable and self-serving as to be devoid of probative value." Bursten, 560 F.2d at 785.
 
 
 18
 Defendant also argues that the statements he made during the two FBI interviews were inadmissible because he was not informed of his Miranda rights prior to the interviews and because he was not inforined that he was under an investigation by a Chicago grand jury. Defendant did not object to the district court's admission of these statements. Failure to object at trial to the admission of evidence constitutes abar to raising the issue on appeal unless plain error exists. Fed.R.Evid. 103.
 
 
 19
 The test to determine whether inculpatory statements made to FBI agents are admissible involves a two-part inquiry. First, the court must consider whether Miranda was complied with. United States v. Murphy, 763 F.2d 202, 205 (6th Cir.1985), cert. denied, 106 S. Ct. 812 (1986). Here, the FBI --agents were not required to administer Miranda warnings to defendant because he was not in custody during either of the two interviews. See California v. Beheler, 463 U.S. 1121, 1123-24 (1983); Oregon v. Mathiason, 429 U.S. 492, 495 (1977) . Second, the court must determine whether the inculpatory statements were made voluntarily. Murphy, 763 F.2d at 205. The fact that defendant was not informed of the Chicago grand jury investigation does not render defendant's statements involuntary. See Murphy, 763 F.2d at 205 (a confession is not involuntary as long as it is the product of free and rational choice). Thus, the district court's admission of the statements was not plain error.
 
 
 20
 C. Dismissal of Indictment.
 
 
 21
 Defendant argues that the district court should have dismissed the mail fraud indictment because the government failed to fulfill its promise not to bring charges against him if he submitted to and passed a polygraph examination. Defendant, relying on Santobello v. New York, 404 U.S. 257 (1971), contends that he is entitled to "specific performance" of the alleged promise just as a defendant is entitled, under appropriate circumstances, to specific performance of an executed plea agreement. Unlike the situation in Santobello, the alleged promise was not part of a consummated plea bargain, nor did defendant in any way relyon the alleged promise to his detriment. Therefore, the alleged promise was not specifically enforceable against the government. See Mabry v. Johnson, 467 U.S. 504, 104 S. Ct. 2543, 2548 (1984).
 
 
 22
 D. Access to Gail Toney.
 
 
 23
 Defendant argues that the district court erred by denying his pretrial motion to compel an interview with Gail Toney. In support of his motion, defendant asserted that the government improperly prevented him from interviewing Toney, who was serving a life sentence in an Ohio correctional facility. In opposition to the motion, the government presented the affidavit of Toney's counsel, Kent R. Minshall, who stated that Toney did not want to be interviewed by defendant's counsel.
 
 
 24
 The prosecution and the defense have an equal right to interview witnesses in a criminal proceeding. United States v. Bittner, 728 F.2d 1038, 1041 (8th Cir.1984); Kines v. Butterworth, 669 F.2d 6, 9 (1st Cir.1981), cert. denied, 456 U.S. 980 (1982); United States v. Scott, 518 F.2d 261, 268 (6th Cir.1975). However, a government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so. United States v. Pinto, 755 F.2d 150, 152 (10th Cir.1985); United States v. Caldwell, 750 F.2d 341, 346 (5th Cir. 1984), cert. denied, 105 S. Ct. 1873 (1985); Kines, 669 F.2d at 9; Bittner, 728 F.2d at 1041; Scott, 518 F.2d at 268. In light of the affidavit of Toney's counsel, the district court did not abuse its discretion by refusing to compel the interview.
 
 
 25
 Defendant also argues that the district court erred by refusing to grant defendant's motion for a new trial based upon an affidavit secured from Toney shortly after the trial. At trial, Toney was called to testify by the government but refused even though she had been granted immunity and ordered to testify. Nevertheless, Toney stated in her affidavit that defendant was innocent, that she would have testified in his behalf had she been able to speak with defendant's counsel, and that Minshall's affidavit was false.
 
 
 26
 Under Rule 33 of the Federal Rules of Criminal Procedure, the district court may grant a new trial to a defendant if it is required in the interest of justice. The decision whether to grant a new trial is committed to the sound discretion of the trial court, and our review is limited to the determination of whether that discretion was abused. United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982), cert. denied, 461 U.S. 945 (1983) . A motion for a new trial based upon newly discovered evidence must show, among other things, that the new evidence would probably produce an acquittal. Id. McLean's testimony, Johnson's testimony, defendant's statements to the FBI, and the recorded conversation between defendant and McLean are highly probative of defendant's guilt. Further, Toney's credibility is undermined by her refusal to testify at trial and her grand jury testimony confirming McLean's account of defendant's involvement in the scheme. It seems highly improbable that Toney's testimony would produce an acquittal, and, therefore, the district court did not abuse its discretion in denying defendant's motion for a new trial.
 
 
 27
 E. Sufficiency of the Evidence.
 
 
 28
 Defendant argues that the evidence was insufficient to support his mail fraud conviction because there was no direct evidence that he mailed the Podborny letter. Our review is limited to the determination of whether the evidence, viewed in the light most favorable to the government, is sufficient for a reasonable trier of fact to find that the evidence established guilt beyond a reasonable doubt. United States v. Johnson, 741 F.2d 854, 856 (6th Cir.) (per curiam), cert. denied, 105 S. Ct. 572 (1984); United States v. Ranzoni, 732 F.2d 555, 559 (6th Cir.), cert. denied, 105 S. Ct. 292 (1984) . In determining the sufficiency of the evidence, it is not necessary that each element of the crime be supported by direct evidence. "[C] ircumstantial evidence alone can sustain a guilty verdict and ... to do so, circumstantial evidence need not remove every reasonable hypothesis except that of guilt." United States v. Stone, 748 F.2d 361, 362 (6th Cir.1984) (emphasis in original); see also Johnson, 741 F.2d at 856. Here, the evidence showed that defendant took possession of the letter and agreed to mail it from New York and that Dimple displayed the letter in Chicago at which time it bore a New York postmark. Thus, there is sufficient circumstantial evidence to sustain the conviction.
 
 III.
 
 29
 Accordingly, the judgment of the district court is AFFIRMED.