**Paul KORDENBROCK,
Petitioner–Appellant,**

v.

**Gene SCROGGY, Warden, Kentucky
State Penitentiary,
Respondent–Appellee.**

**Nos. 88–5467, 89–5107.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 16, 1989.

Decided Nov. 3, 1989.

---

Edward C. Monahan (argued), Timothy T. Riddell (argued), Dept. of Public Advocacy, Frankfort, Ky., for Paul Kordenbrock.

Frederic J. Cowan, Atty. Gen., Cicely Jaracz Lambert, Asst. Atty. Gen., Michael L. Harned (argued), Penny R. Warren, Asst. Atty. Gen., Carol C. Ullerich (argued), Office of the Atty. Gen. of Kentucky, Frankfort, Ky., for Gene Scroggy.

Before KENNEDY, KRUPANSKY and WELLFORD, Circuit Judges.

KENNEDY, Circuit Judge.

Appellant Paul Kordenbrock appeals the District Court's denial of his petition for a writ of habeas corpus. Appellant claims that his conviction for intentional murder, for which he received the death penalty, and attempted murder were obtained in violation of his federal constitutional rights.[1] He raises nine issues on appeal. We agree with the District Court that the introduction of his confession—taken in violation of his *Miranda* rights—was harmless error, and that the other alleged errors did not violate his constitutional rights.[2]

On Friday, January 4, 1980 at 9:30 a.m., appellant Paul Kordenbrock and a codefendant, Michael Kruse, parked across the street from a Florence, Kentucky, Western Auto store. They had planned to steal guns from the store and sell them for drug money. Appellant and Kruse entered the store together. Appellant carried a gun. The owner of Western Auto, William Thompson, was in the front of the store while his employee, Stanley Allen, was in the back. Appellant ordered the men at gunpoint to move to the rear of the store and lie face down. He stood over them with the gun. About that time, Jack Webster and his eight-year-old son came into the store to have his chainsaw repaired. Kruse, posing as a sales clerk, told him they did not do repair work. Webster and his son left, at which point Kruse broke the glass of the gun display case. At that time, appellant shot Allen in the back of the head and Thompson in the neck from a distance of seven to eight feet. Allen died, but Thompson survived. Appellant and Kruse carried the guns to their car and drove off. After they left, Thompson called the police, an ambulance, his wife, and Allen's wife.

---

[1]. Appellant was charged with murder, attempted murder, and first degree robbery. He pled guilty to the robbery charge, for which he was sentenced to 20 years imprisonment. Appellant was also sentenced to 20 years imprisonment for the attempted murder conviction.

[2]. In his petition for habeas relief, appellant raised twenty-three assertions of error. The District Court, after conducting extensive evidentiary hearings, issued a comprehensive published opinion denying relief. *Kordenbrock v. Scroggy,* 680 F.Supp. 867 (E.D.Ky.1988).

The day before the robbery appellant and Kruse were at the Western Auto store from 1:00 to 1:30 p.m. examining wood cutting tools. Thompson was alone at the store and Allen was at lunch. The next day, appellant and Kruse again went to the store at 1:00 p.m., and appellant purchased a hatchet. Appellant also saw several guns in a glass display case and asked to look at a Colt Python pistol. Thompson showed him the gun and appellant and Kruse left the store without incident.

That evening, the two men went to a party at appellant's sister's Cincinnati apartment. Appellant drank beer and whiskey, smoked marijuana, and took some cocaine. He and Kruse spent the night at the apartment, and the next morning appellant drank two beers and took two Quaaludes. They left at 9:00 a.m. to buy a tape deck from a friend of appellant. On the way, they stopped at a gas station where they purchased ten Quaaludes from a Jeffrey Piper. According to Piper, the pair appeared "laid back" on Quaaludes. Appellant and Kruse then went to the Western Auto store and committed the crimes involved in this appeal.

Less than an hour after the robbery, appellant and Kruse went to a Gary Ramell's home where they sold him three of the stolen guns for $200. They then went to the home of Richard Fehler where at 10:30 a.m. they sold two guns, payment for which was due January 15, 1980. According to Fehler, appellant appeared jittery and took some more Quaaludes. That afternoon, appellant met a Larry Hensley who purchased six guns for $300, payable the next day. In the meantime, Ramell saw a newscast about the robbery and murder which included composite drawings resembling appellant and Kruse. Hensley also saw the news and noticed that the guns he bought from appellant came in a Western Auto box containing broken glass. Ramell, Fehler, and Hensley decided to cooperate with the police. Hensley arranged to meet appellant at 10:00 p.m., the day following the robbery, to pay for the guns he received from appellant. Hensley loaned the police his truck, and appellant was arrested at 10:10 p.m. that night. He was taken to the police station for interrogation at about 11:30 p.m. and made a full confession approximately two and one-half to three hours later.

A Kentucky jury convicted appellant of murder and attempted murder. The primary evidence against appellant relating directly to the murder was the testimony of Mr. Thompson and Kordenbrock's confession. The court, upon recommendation of the jury, sentenced appellant to death. Following unsuccessful appeals in Kentucky state courts, he petitioned the District Court for the Eastern District of Kentucky for habeas relief, which was denied. We consider his nine claims of constitutional violations seriatim.

■ First, appellant claims that since he is indigent, the Constitution entitles him to a state-funded psychiatrist to assist him in the guilt and sentencing phase of his trial. Although appellant did not assert insanity as a defense,[3] he hoped to use psychiatric testimony to establish a defense of diminished responsibility based on his habitual drug and alcohol abuse. He also hoped to use the same testimony for purposes of mitigation in the sentencing phase. For the reasons set out below, we agree with the District Court that appellant was not deprived of any constitutional right.

---

3. "Counsel for defendant Kordenbrock have never served notice of an intention to rely upon insanity as a defense. The Court believes that Kordenbrock has been afforded ample opportunity to develop such a defense if one exists." Order Denying Continuance, June 2, 1981, Judge Sam Neace, Boone County Circuit Court. Joint App. at 61. Appellant's counsel testified for the District Court evidentiary hearing on the writ that appellant's sanity was never considered as a defense:

Q: I understand that your belief was at all times that your client was not insane, nor was he incompetent to stand trial. Is that correct?
A: That's my—that was my belief, and that is my belief.

.    .    .    .    .

Q: ... [N]ever at any time did you ever pursuant to the statutory requirements of Kentucky file a notice of your intention to claim an insanity defense, did you?
A: I—that's correct. I had no factual basis to do that.

Appellant obtained the services of a Dr. Melvin Nizny, a Cincinnati, Ohio, psychiatrist. Dr. Nizny examined appellant and gave his attorneys an oral report of his evaluation. Although Dr. Nizny ordinarily did not require payment until after he had testified and even though Dr. Nizny had not submitted a bill, counsel for appellant advised Dr. Nizny that Boone County would refuse to pay his bill. Counsel knew that there was an ongoing dispute over whether the county or the state was responsible for paying experts appointed to assist criminal defendants. Counsel advised the Circuit Court that Dr. Nizny would not give a written report or testify unless he was guaranteed payment. The Circuit Court issued an order directing the Boone County Fiscal Court to pay Dr. Nizny. The Fiscal Court refused to do so. Appellant's counsel made no effort to enforce the order. The District Court found that counsel could have urged the Circuit Court to hold county officials in contempt or to levy on county bank accounts or to subpoena Dr. Nizny to testify.

Dr. Nizny was never advised of the Boone County Court's order directing he be paid one half upon the filing of his report and the other half after he testified. The District Court found that counsel's failure to secure payment and to have Dr. Nizny testify was a deliberate attempt to create an appealable issue. The court concluded that Dr. Nizny's evaluation would not have been useful to appellant's defense, and that his counsel was aware of it. Dr. Nizny's oral report to counsel did not indicate any mental illness. Further, appellant had told Dr. Nizny that on the night before the robbery of the Western Auto store he had robbed a gas station and killed the attendant. The unfavorable nature of Dr. Nizny's report, plus counsel's failure to take any of the obvious steps to obtain Dr. Nizny's assistance, caused the lower court to conclude that appellant was not "denied" psychiatric assistance; he was merely maneuvering to create an appealable issue. *Kordenbrock v. Scroggy,* 680 F.Supp. 867 (E.D.Ky.1988). This is a factual finding made after an extensive evidentiary hearing which can be set aside only if clearly erroneous. *See Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 616 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). Upon examination of the record, we are not persuaded that a mistake has been made. *Id.* ("A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.") Although we do not condone the state's refusal to pay Dr. Nizny, we find no constitutional violation.

■ Counsel's further efforts to secure another psychiatrist failed. The case was again continued (it had previously been continued when Dr. Nizny was unavailable) and the trial court ordered appellant to be examined by a psychiatrist at a state institution who could assist in appellant's defense.

Pursuant to that order, appellant was seen on November 21, 1980, by a Dr. James Bland of Forensic Psychiatry Services, a public hospital operated by the Kentucky Department of Human Resources. Dr. Bland was to examine appellant on the issue of his competency and sanity. Because the state restricted such experts to a neutral and objective evaluation concerning only competence to stand trial and sanity, and because he feared that Dr. Bland's opinion might not remain confidential, appellant's counsel advised him not to cooperate.

On May 15, 1981, appellant requested and was granted the appointment of a Dr. Michael Gureasko to act as a defense psychiatrist. However, on May 18, Dr. Gureasko called the court and told it he would not assist appellant because of a misunderstanding with counsel. The court denied appellant's motion for a further continuance and the case was tried.

Appellant relies on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) for his claim that the Constitution guarantees him a court-appointed psychiatric expert to assist in his defense and in the penalty phase of trial. *Ake* held that:

when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83, 105 S.Ct. at 1096. The Court qualified this right:

This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed....

*Id.* Appellant claims his constitutional rights were violated because the county refused to pay for Dr. Nizny's services and because the state-funded expert offered, Dr. Bland, was limited to determining appellant's competence and sanity, and could not make an evaluation concerning his diminished responsibility or other mitigating factors.

However, appellant's claim that the scope of Dr. Bland's examination and testimony was too limited to be effective is without merit. Dr. Bland testified at the evidentiary hearing in the District Court that he could have addressed all of the psychiatric issues appellant's counsel wanted Dr. Nizny to address.[4] Moreover, appellant's objection that Dr. Bland was neutral and therefore could not give effective defense assistance is without merit. *Ake* merely requires that a *competent* psychiatrist be provided to assist indigent defendants, not the psychiatrist of their choice. 470 U.S. at 83, 105 S.Ct. at 1096. Appellant's argument that Dr. Bland was not required to examine him at his counsel's direction is belied by Dr. Bland's stated willingness to pursue the examination along a course plotted by defense counsel:

Q: ... Would you have—would you have if directed by the court engage in any other matter which the—defendant's attorneys might ask you to pursue, if ordered by the court?

THE COURT: What about number 15, can Paul be rehabilitated? Could you have given the jury in the sentencing phase an opinion on that?

THE WITNESS: That was not an unusual question to be asked, your honor. Yes, I could have.

Dr. Bland was also prepared to investigate and testify as to appellant's family history and psychological background:

Q: As part of your mental—your examination of the accused, Doctor, during this period is a thorough history taking important?

A: Yes.

Q: Would you include in that history as part of your opinions effects of any drugs or alcohol which the defendant might use either chronically, or on the occasion of the crime or on the occasion of a subsequent confession to the crime?

A: Yes. That would be part of the history.

. . . . .

Q: And would you have been prepared to testify, Doctor, if called by the defense if you found there to be any effects of any of those things with respect to any of your opinions as to the capacity of an individual?

A: Yes.

Q: Likewise, family background, intelligence and other environmental factors?

A: Yes, that would be considered.

---

**4.** Dr. Bland was a physician specializing in psychiatry. He testified that he would have been able to examine all areas of appellant that Dr. Nizny was requested to examine:

Q: Are any of the [nineteen] questions posed in the letter from Mr. Monahan to Dr. Nizny ... in that September the 8th, 1980, correspondence that you would have been prohibited, unable, or unwilling to address, had you been able to examine and had Mr. Kordenbrock cooperated with you?

A: I can't say that I would be able to answer all of them in any substantial way. That would depend on a lot of factors. But I didn't see any here that I wouldn't be able to address. And in fact they're the types of questions that are commonly asked in trial proceedings regarding my testimony.

Q: All right. Those questions are commonly posed questions in cases where mental capacity or mental illness might be an issue?

A: Yes.

. . . . .

THE COURT: Turn particularly to number 11, what statutory and otherwise mitigating factors exist in Paul's commission of these offenses? Would you have been able to consider that and testify on that if you had come up with some—if they had come up with something favorable to the defendant?

THE WITNESS: Yes.

. . . . .

A:  Yes.

Q:  Regardless of the amount of time which it might take?

.    .    .    .    .

A:  Yes, I would.

Dr. Bland also stated that his neutral, objective evaluation would have supplied defendant with any information that appellant could use in his defense:

THE COURT: But you would have made the evaluation and called it either way you saw it. You would have made the evaluation. If you thought he was crazy with drugs and irresponsible from the drugs, or couldn't form the criminal intent from the drugs, or form a mitigating circumstance, or anything in his family background were a mitigating circumstance you would have just reported like you saw it, right?

THE WITNESS: I would have just reported it as I saw it and also gave an interpretive opinion about how that might have or might not have in my opinion affected the situation.

We agree with the District Court that Dr. Bland's assistance, had appellant taken advantage of it, would have met *Ake's* command of guaranteeing appellant "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. at 1096. We also agree that as a matter of strategy appellant chose not to avail himself of this witness. His concern over confidentiality could have been met by a court order. The trial court evidenced a cooperative attitude to provide appellant with the service of a psychiatrist.

■ Appellant's constitutional rights under *Ake* were not violated. *Ake's* guarantee of a state-funded psychiatrist arises only after defendant shows that his sanity will be "a significant factor at trial." *Id.* *See also Volson v. Blackburn*, 794 F.2d 173 (5th Cir.1986); *Cartwright v. Maynard*, 802 F.2d 1203 (10th Cir.1986); *Bowden v. Kemp*, 767 F.2d 761 (11th Cir.1985). Appellant never attempted to raise insanity as a defense. At most he sought to show that his capacity was diminished through drug and alcohol use, thus depriving him of the specific intent necessary to convict him of intentional murder. Although *Ake* does not "establish a bright line test for determining when a defendant has demonstrated that sanity at the time of the offense will be a significant factor," it is clear that "*Ake* requires that the defendant, at a minimum, make allegations supported by a factual showing that the defendant's sanity is in fact at issue in the case." *Cartwright*, 802 F.2d at 1212 (quoting *Volson*, 794 F.2d at 176). Such a showing is not made by merely positing that appellant was a habitual drug and alcohol abuser. *See Pedrero v. Wainwright*, 590 F.2d 1383, 1391 (5th Cir.), *cert. denied*, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979) (pre-*Ake* case holding that insanity is not made an issue by showing defendant was a drug addict entitling him to state-funded defense psychiatrist).

■ Finally, even if the state court did improperly deny appellant access to Dr. Nizny, we agree with the District Court that his constitutional rights under *Ake* were adequately protected by the testimony of Dr. Eljorn Don Nelson. Dr. Nelson taught pharmacology at the University of Cincinnati College of Medicine and directed the college's drug and poison information center. He teaches medical students, physicians and psychiatrists about the diagnosis and treatment of drug and alcohol abuse. He had received special training in the area of psychopharmacology. It is again important to note that appellant admittedly never made his *sanity* an issue— he only sought to establish diminished capacity and the inability to form specific intent because of drugs and alcohol. At trial, Dr. Nelson testified that he had examined appellant and detailed his long history of drug and alcohol abuse. He then testified specifically about appellant's mental state at the time of the crime:

Q:  Doctor, do you have an opinion as to Paul Kordenbrock's ability to fully control his actions at 9:30, Saturday, January 5th, 1980, based on ... information about his level of drugs?

A: I think that Paul Kordenbrock was under the influence of alcohol and/or Diazapam and/or Phencyclidene and I think he, probably, as a result of that had a diminished ability to exercise judgment, ethical decisions, and formulate complex thoughts. I think he was basically, in lay terms, he was drunk and stoned. That is my opinion.

Q: ... [D]o you have an opinion as to whether or not Paul Kordenbrock was psychologically and physically addicted to drugs at 9:30 on Saturday, January 5th, 1980?

A: I think he was physically and psychologically addicted to alcohol. If the street tablets contained Diazapam he was certainly psychologically and physically dependent to that.

Dr. Nelson's testimony went to the heart of appellant's defense. On appeal, appellant fails to establish how Dr. Nizny's testimony would differ or add to Dr. Nelson's testimony. Although he claims that Dr. Nizny's testimony would have explained to the jury why appellant behaved the way he did, it appears that Dr. Nelson's examination and testimony were sufficient to establish the defense of diminished responsibility and mental capacity. Simply asserting that Dr. Nizny's testimony would have been beneficial is not enough. "Where a defendant offers 'little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision [to deny psychiatric assistance].'" *Bowden*, 767 F.2d at 765 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985)). Appellant's defense was not that he was insane or mentally diseased—it was only that drugs and alcohol affected his ability to formulate specific intent and should have been used for mitigation in his sentence. Therefore, we agree with the District Court that any error in denying access to Dr. Nizny was harmless to the extent that Dr. Nelson examined appellant and testified to the same issues. Appellant's constitutional rights under *Ake* were not violated.

Lastly, *Ake*'s guarantee of access to psychiatric counsel in the sentencing phase of trial does not apply to these facts. *Ake*'s guarantee applies in two situations—when the defendant's sanity is a significant factor at trial and "in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." 470 U.S. at 83, 105 S.Ct. at 1096. *Ake* only guarantees a defendant the right to a psychiatrist at the sentencing phase to oppose the government's psychiatric testimony. The Supreme Court explained that the need for a defense psychiatrist arises only when the government uses an expert because "[w]ithout a psychiatrist's assistance, the defendant cannot offer a well-informed expert's *opposing* view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the *State's proof of an aggravating factor*." *Id.* at 84, 105 S.Ct. at 1097 (emphasis added). In *Bowden*, the court stated that "[u]nlike the sentencing situation in *Ake*, Bowden's prosecutor had no need to present psychiatric evidence to show an aggravating factor, and he presented none. The dangers and inequities which concerned the Court in *Ake* consequently do not exist." 767 F.2d at 764 n. 5. Nor do those dangers and inequities exist in this appeal. The state presented no psychiatric experts at the sentencing phase, only a doctor who was a general family practitioner who testified about the effects of drugs. As such, appellant was not constitutionally entitled to a state-funded psychiatrist under *Ake*. In addition, the testimony given by Dr. Nelson went to the effects of his drug and alcohol abuse and could be used for purposes of mitigation and to counter the state's witness.

Appellant next claims that his confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that it was not voluntary, and that its admission prejudiced the jury in the sentencing phase. The District Court found that although appellant's confession was obtained in violation of *Miranda*, its admission was harmless error and that appellant waived any

violation by using the confession affirmatively in his opening statement and as a mitigating factor in the sentencing phase of trial as part of his defense strategy. Appellant asserts, however, that its admission was still not harmless error with regard to sentencing because its cold calculated tone may have impacted on the jury's determination of his sentence in violation of his eighth amendment right to a reliable determination of guilt and sentence. We agree with the District Court that no constitutional violation occurred.

Both the state courts and the District Court found that appellant's will was not overborne and that his confession was the product of free will and rational choice. *See United States v. Murphy*, 763 F.2d 202 (6th Cir.1985). Voluntariness of a confession is a mixed question of law and fact and a reviewing court "will not disturb the trial court's findings ... unless clear error appears on the record." *Id.* at 205–06. Voluntariness is determined by the totality of the circumstances surrounding the confession, taking into consideration the accused's age, intelligence, physical and emotional state, and the inherent coerciveness of the interrogation setting. *Id.* at 205.

Review of the record shows that although the interrogators at times threatened that several of appellant's friends would be arrested if he did not continue to give a fuller statement, the record as a whole indicates that the trial court's finding of voluntariness was not "clear error." Appellant was cogent, there was no force or threat of force by police, and he was not emotionally distressed. *Cf. United States v. Brown*, 557 F.2d 541 (6th Cir.1977).

■ The District Court found that introduction of appellant's written confession was, however, in violation of his *Miranda* rights because his request to stop the questioning until the next day was not honored. Under *Miranda*, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473–74, 86 S.Ct. at 1627. The Supreme Court has said that "the admissibility of statements obtained after the per-

son in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). After admitting that "I did it.... That's all I can tell you is that I did it" and "Sir, I did it I told you," appellant attempted several times to postpone further interrogation to the next day. Urged by the further interrogation of the police, he went on to detail the robbery and murder, saying at one point that "I tried to shoot them so they would not get up." After holding that the continued questioning violated *Miranda*, which Kentucky has not appealed, the District Court went on to find its admission harmless.

After careful review of the entire record, we agree that admission of the confession was harmless. Before he asked to stop the interrogation, appellant had admitted committing the murder. This admission was made after he waived his *Miranda* rights. The basic admission of guilt was thus not obtained in violation of *Miranda*. In analyzing the impact of the entire written confession on the trial, appellant has asked that we distinguish its effects on the guilt phase from its effects on the sentencing phase. Appellant argues that "[e]ven if it could be possibly argued that the error complained of herein was harmless as to the conviction, it cannot be argued that it was harmless as to the sentence of death." Appellant's Brief at 58. As the District Court found, appellant used his confession as part of his defense strategy. He did not deny committing the murder and attempted murder, but rather sought to explain the circumstances and avoid the death penalty. In the guilt phase, appellant's strategy was to confess to the jury early on. At the beginning of the trial he personally addressed the jury, openly admitting his guilt but indicating that he was under the influence of drugs and intoxicated at the time of the crime. He argues that this strategy was hampered by the callous tone of his written confession, which did not mention intoxication or drug use and which included the statement that he shot the victims "so they wouldn't get up."

Appellant argues that his personal statement to the jury admitting the murder and attempted murder was not a matter of choice, but was rather a strategy he was forced into because the trial court erroneously refused to suppress his written confession, taken in violation of his constitutional rights. However, we agree with the District Court that it is clear that appellant would have adopted this trial strategy even if his confession had been excluded in view of the overwhelming independent evidence of his guilt. In *Burks v. Perini*, No. 85–3507 (6th Cir., Nov. 25, 1986) [810 F.2d 199 (table)] (unpublished opinion) this Court held that admission of an invalidly obtained confession was harmless error and rejected the defendant's claim that he confessed to the jury as part of his defense strategy only because the trial court erroneously admitted his illegal confession. Under circumstances impossible to distinguish from those of this appeal, the defendant, Burks, shot two men, one of whom died and the other of whom (Hernandez) survived. This Court reasoned:

> Hernandez, who was the only eye witness to the shootings, testified that Burks had shot both men without provocation. In light of this substantial independent evidence that Burks had indeed shot both of the victims and that the shootings were unprovoked, a self defense theory was the only recourse available to Burks to justify the shootings. Since Hernandez and Burks were the only witnesses to the actual shootings, Burks was confronted with the dilemma of permitting the jury to consider his guilt or innocence on the sole condemning testimony of Hernandez or, in the alternative, testifying on his own behalf and asserting that he shot the two men in self defense. He elected the latter course of action, but failed to convince the jury of his claimed defense. Accordingly, this court concludes that the government's use of Burks' involuntary statement did not induce him to testify on his own behalf and that the trial court's decision to admit his confession, although erroneous under the circumstances, constituted harmless error.

*Id.*, slip op. at 3. Similarly, overwhelming evidence existed to convict appellant. There was the testimony of Mr. Thompson, who positively identified appellant as the murderer. Appellant had been in the store twice in the days immediately before the robbery. There was appellant's possession and sale of the guns almost immediately following the robbery and there were his oral admissions of the killings before he asked to stop the interrogation. No rational juror could have failed to find him guilty of killing Allen and attempting to kill Thompson.

Appellant's sole possible defense was to admit to the killing and claim diminished capacity. Appellant was "confronted with the dilemma of permitting the jury to consider his guilt or innocence on the sole condemning testimony of [Thompson] or, in the alternative, testifying on his own behalf and asserting that he shot the two men" while in a diminished capacity. Appellant, like Burks, confessed to the jury because it was the only possible way to avoid the death penalty. We adopt *Burks'* analysis and find that here, as in *Burks*, the state's use of his illegally obtained confession did not induce appellant to make the statement he did to the jury. The erroneous admission of the confession was on the entire record harmless.

Appellant's reliance on *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) is inapposite. There, the Court held that the defendant's confession at trial, which was used to avoid the effects of three illegally obtained confessions, was improperly obtained "fruit of the poison tree" because it was induced by the prior confessions. The defendant's in-court confession was used to give a version of facts *different* from his prior confessions. Here, however, appellant *adopted* his prior confession and used it to support his defense. We agree with the District Court that this was a defense strategy to avoid conviction and imposition of the death penalty, and it was a strategy appellant would have followed even if his original confession had been excluded. Because *Harrison* applies only where admission of

an illegally obtained confession *induces* a defendant to testify, *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985),[5] it is inapplicable here. As the District Court found, appellant's admission in court was the only basis of ameliorating what otherwise appeared to be a cold-blooded execution and a botched attempt at a second one.

Appellant asserts that even if the confession was harmless in the guilt phase due to the presence of overwhelming independent evidence of guilt, it may have caused at least one juror to impose death [6] because it contained his statement that he tried to shoot Allen and Thompson "so they wouldn't get up." In his statement in court, appellant explained the circumstances surrounding the crime, including his intoxication and use of Quaaludes. He also explained that he "never intended to shoot anybody," that he had been "living with [the shooting] for the past eighteen months and twenty-six days," and that he didn't "know how to put into words how I feel." Appellant's opening statement. Appellant directs us to *State v. Lee*, 524 So.2d 1176 (La.1987); *Cannaday v. State*, 455 So.2d 713 (Miss.1984), *cert. denied*, 469 U.S. 1221, 105 S.Ct. 1209, 84 L.Ed.2d 351 (1985). These cases relied on the fact that the defendants' confessions showed they had no remorse for their crimes and therefore could have influenced the jury to recommend death. However, in appellant's case we have his statement made to the jury for the express purpose of showing remorse. Read in its entirety, the earlier confession does not significantly differ from appellant's in-court admission. He also claims the confession was prejudicial because it failed to mention his drug and alcohol use. However, there was overwhelming and uncontradicted evidence presented to the jury tracing appellant's drug and alcohol use. We find that its effect in the sentencing phrase was harmless beyond a reasonable doubt.

Appellant next claims his sixth, eighth, and fourteenth amendment rights under *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) were violated by the state's use of the word "recommend" in reference to the jury's role in imposing capital punishment. KRS 532.025(1)(b) provides that upon a finding of guilt in a capital case tried before a jury:

> the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances ... exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.

During voir dire the Commonwealth attorney stated to members of the jury that on the intentional murder count they would be required to recommend the sentence to the judge who "imposes that sentence." It was explained that the judge "heavily" considered the recommendation or that he would give the recommendation "great weight." The penalty phase jury instructions also told the jurors that on the death count they should recommend one of the three possible sentences, 20 or more years, life imprisonment, or death. Appellant claims that because the state characterized the jury's role in imposing capital punishment as one of "recommending" death, the jury perceived that its decision was not final and therefore felt less responsible in imposing the death sentence. Under *Caldwell*, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639. The question then is whether the state's use of the word "recommend" impermissibly lessened the jury's

---

**5.** The District Court also held that *Elstad* implicitly overruled *Harrison*, citing *United States ex rel. Perri v. Director*, No. 83 C 1439, 1985 WL 2591 (N.D.Ill. Sept. 16, 1985). Because reaching that issue is not essential to our disposition of this case, we take no position on the correctness of this holding.

**6.** Kentucky allows the imposition of death only if the jury unanimously recommends it.

sense of responsibility in imposing death and caused them not to appreciate their responsibility. We find that the jury was not misled and therefore affirm the District Court.

The state's use of the word "recommend" did not violate appellant's constitutional rights under *Caldwell*. *Caldwell*, as well as post-*Caldwell* cases appellant relies upon, are distinguishable. Each case involved deliberate attempts by the state to convince the jury that responsibility for imposing death rested elsewhere. In *Caldwell*, the prosecutor told the jury its decision regarding punishment is not final, and that their "job [in imposing death] is reviewable," the decision you "render is automatically reviewable by the Supreme Court" and that "your decision is not the final decision." *Id.* In *Sawyer v. Butler*, 848 F.2d 582, 597 (5th Cir.1988), the prosecutor told the jury that "if you are wrong in your decision, believe me, there will be others who will be behind you to either agree with you or to say you are wrong." In *Adams v. Wainwright*, 804 F.2d 1526, 1528 (11th Cir.1986), the court told the jury that the "Court is not bound by your recommendation [of death]. The ultimate responsibility for what this man gets is not on your shoulders. It's on my shoulders. You are merely an advisory group to me in [the sentencing phase]." In *Ward v. Commonwealth*, 695 S.W.2d 404, 408 (Ky.1985), the prosecutor told the jury that if they "were to decide to recommend, and it is only, I want to point this out again to you, a recommendation. If we do [get the recommendation] it [the death penalty] may very well not [happen]." In *Frye v. Commonwealth*, 231 Va. 370, 345 S.E.2d 267, 284 (1986), the prosecutor told the jury that the "judge will be the person that fixes sentence if you find the defendant guilty ... and fix punishment at death. The Court will pronounce sentence."

In contrast to these cases, the prosecutor in the present appeal neither explicitly nor implicitly tried to persuade the jury that its

recommendation of death would not be final. He was careful to point out that the court would give the jury's recommendation "great weight" or "heavily" consider it. Nowhere in the record does appellant point to any statement indicating to the jury that it would not be responsible for the sentence of death. There were no representations to the jury that their sentence would be reviewed or that the final decision of death would rest elsewhere. This is clearly distinguishable from the cases cited by appellant. The Court in *Caldwell* was also concerned that the argument was inaccurate and misleading as to the nature of the appellate court's review. The appellate courts in Mississippi do not impose the death penalty, but rather merely review the jury's decision and that review is done with a presumption of correctness. There is no appellate mercy. 472 U.S. at 331, 105 S.Ct. at 2640.

Here, neither the Commonwealth attorney nor the trial court misstated the law. The jury's function is to make a recommendation which is given great weight by the judge. There was no effort to diminish the jury's responsibility.

In addressing this same constitutional issue, the Eleventh Circuit has ruled that no constitutional violation occurs by merely referring to the jury's "recommendation":

> We believe the Supreme Court intended that a *Caldwell* violation should include some affirmative misstatement or misconduct that misleads the jury as to its role in the sentencing process. *Caldwell* does not mandate reversal if an *advisory* jury is told that its role is to advise or to recommend.... [E]mphasizing ... the fact that the jury is making a "recommendation" to the judge, does not support a *Caldwell* claim. Such statements are neither inaccurate nor misleading.

*Harich v. Dugger*, 844 F.2d 1464, 1473–74 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989) (emphasis in original).[7] In the present appeal,

---

7. In *Harich*, the jury was told that its sentence was an advisory recommendation and that the court would impose the final sentence. On appeal in a habeas proceeding, the Eleventh Circuit said "[n]either the prosecutor nor the trial judge implied that the jury's recommendation was superfluous. The fact that the jury knew they were making a recommendation did not

the prosecution made no statement to the jury beyond the fact that it was to recommend a sentence. Even then it reiterated that the court would give their recommendation "great weight." We conclude that in this context mere use of the word "recommend" did not violate appellant's constitutional rights under *Caldwell.*

While not dispositive of the constitutional issue, we find further support for this result in Kentucky cases holding that use of the word "recommend" by itself is not reversible error. *See Sanborn v. Commonwealth,* 754 S.W.2d 534, 546 (Ky.1988); *Matthews v. Commonwealth,* 709 S.W.2d 414, 421 (Ky.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986) ("[U]se of the word 'recommend' ... is not incorrect as long as the context in which it is used does not mislead the jury as to its ... responsibility in exercising its sentencing function."); *Skaggs v. Commonwealth,* 694 S.W.2d 672, 679 (Ky.1985), *cert. denied,* 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986) (" '[R]ecommendation' is used in the statute and it is clearly proper to refer to it as such. The error occurs when, because of additional comments, a message is conveyed that the juror's decision is not the final one.").[8]

■ Appellant also argues that the Kentucky Supreme Court's new procedural requirement announced in *Tamme v. Commonwealth,* 759 S.W.2d 51 (Ky.1988) that juries be instructed to "fix," not "recommend," capital punishment, should be applied retroactively to invalidate appellant's sentence. *Tamme* disallowed use of the word "recommend" in favor of "fix" when referring to the jury's role in imposing the death sentence. Appellant argues that if *Tamme* were applied to his case, use of "recommend" would have been reversible error under Kentucky law. He therefore urges that we apply *Tamme* retroactively and grant him relief. However, to say that Kentucky law now prohibits use of the word "recommend" when referring to the jury's sentencing role does not make out a

*constitutional* error. Because this case is before us on habeas review, we are limited to granting relief for violations of the "Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and we can give relief for state court error only where the alleged error is of constitutional proportions. *Dupuie v. Egeler,* 552 F.2d 704, 710 (6th Cir.1977); *Jenkins v. Bordenkircher,* 611 F.2d 162 (6th Cir.1979), *cert. denied,* 446 U.S. 943, 100 S.Ct. 2169, 64 L.Ed.2d 798 (1980). Failure to apply *Tamme* to appellant's case would at most make out a violation of state law only. Although using "recommend" may now violate Kentucky state law, it does not offend appellant's constitutional rights.

■ Appellant next claims the trial court's refusal to permit the testimony of Dr. Glen Stassen, a Christian Ethicist at the Southern Baptist Theological Seminary, violated his constitutional right to have the jury consider any evidence offered in mitigation for a sentence less than death. *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir.1983). The District Court held that Dr. Stassen's testimony was cumulative and irrelevant.

Dr. Stassen was to testify as to appellant's familial relations, his sorrow for committing the crime, his history of drug abuse, and his potential for rehabilitation. The record shows that Dr. Stassen's proposed testimony was primarily a general discussion addressing various religious and philosophical positions with regard to the death penalty. The witness had only talked to appellant for 45 minutes the morning he was to testify. As the trial court found, it added little to the jury's understanding of appellant that was not already provided by appellant's family. As *Skipper* makes clear, evidence from a nonfamily member is not excludable as cumulative, since the jury may give more weight

---

detract from the importance of their decision." 844 F.2d at 1475.

8. Note that although the phrase still exists in the statute, use of "recommend" is now prohibited in Kentucky. *Tamme v. Commonwealth,* 759 S.W.2d 51 (Ky.1988).

to the testimony of non-family members. Nonetheless, the testimony of such non-family members must still be shown to be relevant. *See Lockett,* 438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstance of his offense."). We agree with the District Court that excluding Dr. Stassen's testimony was within the discretion of the trial court and that the court did not abuse that discretion. Although appellant has a right to place any evidence before the jury for purposes of mitigation, that right is limited by the fact that it be relevant, the determination of which rests with the trial judge. Moreover, exclusion, even if improper, was harmless to the extent that Dr. Stassen's testimony was cumulative to that of Reverend Thomas Feamster. Appellant's constitutional rights were not violated on these facts.

■ Appellant next argues his constitutional rights were violated when the trial judge instructed the jury in the penalty phase that an *aggravating* factor had to be found unanimously, but was silent with regard to how many had to agree in finding a mitigating factor. He claims this caused the jury to mistakenly believe that finding a mitigating factor also required unanimity. In reviewing this claim, we first note that errors of instruction are not reviewable in a habeas proceeding unless they work to deprive appellant of due process. *Long v. Smith,* 663 F.2d 18 (6th Cir.1981), *cert. denied,* 455 U.S. 1024, 102 S.Ct. 1724, 72 L.Ed.2d 143 (1982). The standard for determining this is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," not merely whether it is erroneous. *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). It is clear that the instructions given here did not "infect the entire trial" and deny appellant due process.

■ As the District Court held, there is nothing in the instructions that would lead the jurors to believe that finding a mitigat-ing factor required unanimity. The instructions carefully stated that finding an *aggravating* factor required such agreement, but it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury to assume that unanimity was also a requirement. The instructions were not misleading. We therefore conclude that the instruction did not deprive appellant of due process or invade any constitutional right.

■ Appellant next claims that his constitutional rights were violated by the trial court's failure to change venue because of adverse and prejudicial publicity surrounding the trial. He cites much data indicating there was extensive media coverage, that many people in the area knew of the case and that some had formed opinions about appellant's guilt. Despite widespread publicity, however, we find that appellant's constitutional rights were not violated by the trial court's refusal to change venue.

We recognize, of course, that appellant has a sixth amendment right to be tried by a "panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The standard for determining juror impartiality in the presence of extensive media coverage was outlined in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975):

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 800, 95 S.Ct. at 2036 (quoting *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642). Thus, the jury need not be totally ignorant of the case to be impartial.

In this case, the individual jurors stated they could set aside their opinions and render a verdict based on the evidence, at which point the burden shifted to appellant

to show "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Id.* The trial judge found there was no such showing, and his findings with regard to juror impartiality are to be given special deference. *See Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Brofford v. Marshall,* 751 F.2d 845 (6th Cir.), *cert. denied,* 474 U.S. 872, 106 S.Ct. 194, 88 L.Ed.2d 163 (1985); 28 U.S.C. § 2254(d). The court concluded after hearing testimony from several experts that there was no actual prejudice, nor was there a likelihood that appellant could not get a fair trial in the area. It found that most of the media coverage immediately before trial was descriptive of routine courtroom events and that the adverse publicity cited by appellant was over a year old at the time of trial. The trial court's finding that publicity did not prejudice the jury was not clearly erroneous. Appellant does not establish that he was denied a fair trial merely because of extensive media coverage.

■ Appellant next claims that he was denied due process when the trial judge denied appellant's motion that he recuse himself. The judge was represented by the Commonwealth Attorney when appellant filed a writ of prohibition against him in the Kentucky Court of Appeals to prevent the judge from hearing the case in Boone County. Relying upon *Rapp v. Van Dusen,* 350 F.2d 806 (3d Cir.1965), he claims he was denied due process because he was prosecuted by "an advocate who has already acted as the judge's counsel in the same litigation." *Id.* at 812. As the District Court found, however, the judge was named in the suit as a nominal party only and as such was not required to recuse himself. *See General Tire & Rubber Co. v. Watkins,* 363 F.2d 87 (4th Cir.), *cert. denied,* 385 U.S. 899, 87 S.Ct. 204, 17 L.Ed.2d 131 (1966). Because the judge had no personal interest in the prohibition proceeding, there was no justification for his recusal. Moreover, appellant fails to indicate how he was prejudiced by the trial judge's failure to recuse himself. *See United States v. Harrelson,* 754 F.2d 1153,

1165 (5th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985) (recusal not necessary absent specific conduct evidencing prejudice against defendant). We agree with the District Court that the record does not reveal any conduct by the trial judge evidencing prejudice or bias by the trial court. Appellant was thus not denied due process.

■ Finally, appellant claims that he was denied his constitutional rights when the police erased the tape of his confession and lost a vial of pills and photo display. He first argues that Mr. Thompson's identification of him was influenced by a photo display which improperly suggested that appellant was the suspect. The display consisted of six photographs, all of them mug shots except for appellant's, which was an ordinary snapshot. Appellant argues he was prevented from making a showing to the jury that there was a substantial likelihood of misidentification because the police destroyed the display. Due process is violated where a photo display creates a "very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Court set out five factors to consider in determining whether there is a substantial likelihood of misidentification. Under the first—the opportunity of the witness to view the accused at the time of the crime—Mr. Thompson saw appellant on both days prior to the shooting in his store for periods of about 30 minutes. He showed appellant a small pistol the day before, and he observed appellant just prior to the shooting. The witness therefore had ample opportunity to observe appellant.

The second *Neil* factor is the witness' attention. Mr. Thompson was interviewed by police an hour after the shooting. The interviewing officer commented on how surprised he was at Mr. Thompson's alertness and coherence. Thompson was also able to give an accurate description of appellant. We thus agree with the District Court's finding that Mr. Thompson dis-

played a good deal of attention. Similarly, *Neil*'s third factor—that the witness' prior description of the accused is accurate—is met in this case. Thompson said appellant looked like Kenny Rogers, had light brown hair and brown eyes, and a full beard and moustache. Thompson also helped police in making a composite drawing of appellant that day.

*Neil*'s fourth factor—that the witness demonstrate certainty upon confronting the accused—was also met. Although appellant was groomed differently in a lineup and the lighting was poor, he identified codefendant Kruse as being involved in the robbery and appellant as the one who did the shooting. Thompson demonstrated a good degree of certainty in making this identification.

Lastly, the amount of time between the crime and the confrontation was sufficiently short. Thompson picked appellant out of the lineup less than a month after the crime. We agree with the lower court that this amount of time was sufficiently short to guarantee reliability. When considered together, the factors outlined in *Neil* are met in this case and lead us to conclude that the photo display did not cause a substantial likelihood of misidentification. Thus, losing the photographs did not deprive appellant of the opportunity to make a showing to the jury that misidentification was an issue.

■ Moreover, the District Court was correct in holding that destruction of the photo display did not constitute constitutional error. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) held that to show constitutional error in destroying evidence, it must be apparent that the evidence had exculpatory value and that appellant would not be able to get comparable evidence by any other reasonable means. *Id.* at 488–89, 104 S.Ct. at 2533–34. Here, appellant could have cross-examined Thompson to determine whether he was influenced by the format of the display. In addition, it cannot be said that the display had apparent exculpatory value or would play any part in appellant's defense at the time it was lost.

■ Appellant also claims the police misplaced a vial of pills which he hoped to use in his defense of diminished capacity through drug use. This claim is wholly without merit. Under the *Trombetta* test, the vial of pills did not have apparent exculpatory value. Indeed, appellant himself only claims that he was denied his right to present "a complete defense" by showing that he possessed drugs at the time of the crime. More significantly, the vast majority of his evidence at trial regarding drug ingestion and intoxication came from his own statement to the jury and from those who saw him immediately before and after the crime. Appellant had and utilized several avenues for showing that he was drugged and intoxicated. The failure to preserve the vial did not deny him this defense.

■ Appellant asserts that his constitutional rights were also violated when the police erased the tape of his confession. Appellant claims that he could not make a complete pre-trial attack of the confession without the tape, since it alone revealed the tenor and tone of the interrogation. With it, he hoped to make a pre-trial challenge on due process and fifth amendment grounds.

This claim similarly has no merit. First, although the Kentucky Supreme Court urges officials to keep recordings of confessions, *Hendley v. Commonwealth*, 573 S.W.2d 662, 667 (Ky.1978), the police may dispose of them unless defense counsel specifically asks that they be preserved. Here, appellant's confession was erased before a request was made to preserve it. Second, its erasure did not preclude appellant from making a meaningful challenge to his confession. The confession was in permanent, transcribed form. The dialogue, questions, and other relevant aspects of the interrogation were available for appellant to challenge. Although the verbal tone and tenor of the interrogation was lost with the tape, appellant admitted that the transcript accurately reflected the interrogation. He cannot now disavow that admission and claim it was not accurate. Also, the tape's exculpatory value

was not apparent to the police at the time it was erased.

Any doubt that the state's failure to preserve these pieces of evidence did not amount to a denial of due process was laid to rest by the Supreme Court in *Arizona v. Youngblood,* —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). *Youngblood* held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* 109 S.Ct. at 337. In *Youngblood,* the police failed to preserve the semen-stained clothing of a rape victim, which the defendant sought to use to prove his innocence. The Court said that the "failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent." *Id.* In the present appeal, appellant makes no allegations or showing that the police acted in bad faith in erasing his taped confession or losing the vial of pills and photographic display. We find no constitutional error upon which to grant appellant habeas relief.

### CONCLUSION

Upon review of the record and consideration of all of appellant's claims, we conclude that appellant failed to establish that any constitutional right was offended in the Kentucky trial court. Accordingly, we AFFIRM the District Court's judgment denying appellant's petition for a writ of habeas corpus.

WELLFORD, Circuit Judge, concurring.

I concur generally in my colleague's well considered opinion in this difficult case but write separately on the issues most troubling. First and foremost, I find no reversible error in the guilt phase of the proceeding in which Kordenbrock was convicted of murder and attempted murder and pleaded guilty to armed robbery. The most serious question raised in this respect concerned the circumstances of Kordenbrock's confession to police officers after being taken into custody.

The officers followed the prescriptions of the warnings to the defendant set out in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which "promulgated a set of safeguards to protect the there-delineated constitutional rights of persons subjected to custodial police interrogation." *Michigan v. Mosley,* 423 U.S. 96, 99, 96 S.Ct. 321, 324, 46 L.Ed.2d 313 (1975). The latter case discussed in particular the custodial suspect's "option to terminate questioning," which must be "scrupulously honored." 423 U.S. at 103, 96 S.Ct. at 326. *Mosley* decided that "admissibility of statements obtained after the person in custody has decided to remain silent" must be denied in order to effectuate the protections sought to be achieved in *Miranda. Id.* at 104, 96 S.Ct. at 326.

I cannot reach any conclusion but that the Kentucky officers involved in the questioning of defendant did not carefully observe Kordenbrock's option to postpone the custodial interrogation. I agree, however, that Kordenbrock did voluntarily confess to them during the initial phase of the questioning that he committed the shootings of the two victims. In my view, then, the officers should have been permitted to testify that Kordenbrock confessed to the shootings but should not have been permitted to introduce the details, including the full written version.

The error in admitting the more detailed admissions of Kordenbrock's admissions constituted, in my view, harmless error. Kordenbrock was well aware of his situation in discussing the charges, he had experience in dealing with police and was generally accountable for knowing his rights in this respect. The evidence of guilt, apart from the confession, was very strong. I therefore find no error in the rationale of the district court in its discussion of this issue and also find *Martin v. Wainwright,* 770 F.2d 918 (11th Cir.1985) on point. *See also Burks v. Perini,* No. 85–3507 (6th Cir. Nov. 25, 1986) [810 F.2d 199 (table) ] (unpublished opinion). It should be pointed out that the decision in *Michigan v. Mosley* overturned a Michigan appellate decision which reversed a murder conviction based

on an overly strict interpretation of *Miranda* and striking of a confession after the defendant had at first indicated he did not want to answer questions. The point in *Mosley* was that the defendant had not indicated that he persisted in his initial decision to remain silent.

The trial court's decision to admit the entire confession no doubt impacted upon defendant and his course at trial, on advice of his counsel, at the guilt stage to admit guilt to the jury in an opening statement but to try to set out extenuating or mitigating circumstances of the murder without having to take the witness stand under oath. This action complicates the confession issue for me, but it does not affect my conclusion that only harmless error was involved beyond a reasonable doubt. That these circumstances may complicate this issue should not be taken as a criticism of counsel's strategy in this respect faced with the enormity of the factors and proof arrayed against his client. I cannot say, however, that defendant would have adopted this trial strategy had most of the confession details been excluded, nor can I agree with the district court that this was a "deliberate waiver of any *Miranda* violation." 680 F.Supp. at 880.

The second difficult question revolves around the requirements of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) and defendant's asserted constitutional right to an independent psychiatrist under the circumstances. Emphasis in *Ake* throughout is upon the fact that defendant presented a "sole defense" of "insanity." 470 U.S. at 72, 105 S.Ct. at 1091. At the initial opportunity, at a pre-trial conference, Ake's attorney "informed the court that his client would raise an insanity defense." *Id.* at 72, 105 S.Ct. at 1090. The trial court was aware that at and after arraignment defendant's conduct had been so "bizarre" that he was ordered examined for competency to stand trial. The defendant's request was denied and the court emphasized that "there was no expert testimony for either side on Ake's sanity at the time of the offense." *Id.* at 72, 105 S.Ct. at 1091.

The court's holding addressed this particular issue of "sanity" stating:

We hold that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one.

470 U.S. at 74, 105 S.Ct. at 1091.

The court in *Ake* explained that the basis for this holding was that this afforded the indigent defendant "a fair opportunity to present his defense." *Id.* at 76, 105 S.Ct. at 1092. The other holding in *Ake* related to the penalty phase of that case where the state presented psychiatric testimony regarding the future dangerousness of the defendant. In that specific factual setting, *Ake* held:

Ake's future dangerousness was a significant factor at the sentencing phase. The state psychiatrist who treated Ake at the state mental hospital testified at the guilt phase that, because of his mental illness, Ake posed a threat of continuing criminal violence. This testimony raised the issue of Ake's future dangerousness, which is an aggravating factor under Oklahoma's capital sentencing scheme, ... on which the prosecutor relied at sentencing. We therefore conclude that Ake also was entitled to the assistance of a psychiatrist on this issue and that the denial of that assistance deprived him of due process.

470 U.S. at 86, 87, 105 S.Ct. at 1098.

Justice Burger, concurring in *Ake*, took pains to caution about the narrow application of the holding by stating "[T]he facts of the case and the question presented confine the actual holding of the Court."

The facts in this case, by contrast, indicate that defendant never presented an insanity defense to the court or jury. The trial judge, who made extensive efforts to provide Kordenbrock expert psychiatric assistance, was apparently under the impression that Kordenbrock was claiming insanity or that his counsel was investigating an insanity plea. The district court found that

he was hoping "to raise a defense of diminished responsibility" based on "habitual use of drugs." 680 F.Supp. 872. The district court determined that it became "apparent" that Dr. Nizny, the psychiatrist consulted who was approved by the court to serve to assist defendant "would not be helpful to Kordenbrock's case." 680 F.Supp. 872. I do not believe a fair reading of the evidence supports that view,[1] but I conclude the district court was not in error in finding that the failure of the state to provide payment for Dr. Nizny's services did not deprive defendant of a "fair opportunity to present his defense," within the meaning of *Ake*.

Justice Marshall, author of *Ake,* himself observed "we limit the right we recognize today," and thus it did not impose a heavy financial burden on the state.[2] 470 U.S. at 79, 105 S.Ct. at 1094.

Defendant did present expert testimony on the effect of his drug habits and his ingestion prior to the murder. He was not precluded from presenting a diminished capacity defense. *Ake* does not compel a conclusion that constitutional error occurred with respect to expert and psychiatric testimony available to this defendant either at the guilt stage or the penalty stage of this case. Diminished capacity, like mental retardation, may well be a mitigating circumstance, but as recently indicated by the Supreme Court, existence of limited mental capacity does not preclude a jury's finding of the death penalty under appropriate circumstances. *See Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

One must comment on the failure of the police to retain evidence of the photo spread and the bottle of pills in this case. These failures deserve approbation but

they do not constitute reversible error as found by the district court.

Finally, Kentucky law on the question of the jury's role in the death penalty process has created some confusion in this case prior to its clarification. As noted by the Kentucky Supreme Court, "[T]he word 'recommend' was used, but not to such an extent as to denigrate the responsibility of the jury in imposing the death penalty." 700 S.W.2d at 389.

As well set out in my colleague's opinion and analysis, there was no "affirmative misstatement or conduct that misleads the jury as to its role" in this case. *Harich v. Dugger,* 844 F.2d 1464, 1473 (11th Cir. 1988).

I therefore concur in the decision to affirm the denial of habeas corpus relief.

---

1. I do find support for the district court's view that *defense counsel pursued a "deliberate defense strategy" not to cooperate with available "neutral" state employed psychiatrists who might have provided defendant testimony or evaluation beyond the stated policy limits of "competency and sanity." 680 F.Supp. 873.*

2. Justice Leibson, the dissenting judge in the Kentucky Supreme Court in the direct appeal properly, in my view, pointed out that the trial

court acted within its authority in ordering *Boone County to provide private psychiatric services for Kordenbrock and should have taken necessary steps to enforce its order. 700 S.W.2d 384, 390. This failure on the part of the court; defendant's counsel's failure to pursue; and the recalcitrance of Boone County to provide payment for Dr. Nizny do not, however, constitute a constitutional deficiency.*